

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ANDREA McKINNEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.:** |
| | ) | **5:08-cv-1277-PWG** |
| **AQUATIC GARDENS, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

In this action brought pursuant to 42 U.S.C. § 1981, Andrea McKinney claims that her former employer, Aquatic Gardens, Inc. ("Aquatic Gardens"), paid her less than similarly situated white employees, subjected her to a hostile work environment, and constructively discharged her because of race. (*See* Complaint ("Compl."), Doc.[1] 1). The action is now before the court[2] on Aquatic Gardens's motion for summary judgment. (Doc. 17). Both sides have filed briefs and evidence in support of their respective positions on the motion, which is ripe for decision.[3] In addition, Aquatic Gardens has moved to strike or otherwise exclude McKinney's declaration that she offers in opposition to summary judgment, on the ground that it allegedly conflicts with her prior deposition testimony. (Doc. 27). The court concludes that Aquatic Gardens's motion to strike is due to be

---

[1] References herein to "Doc. __" are to the docket numbers assigned by the Clerk of the Court to the pleadings filed in this matter.

[2] The action is assigned to the undersigned magistrate judge pursuant to the provisions of 28 U.S.C. § 636(b); the General Orders of Reference dated July 25, 1996 and May 8, 1998, as amended July 27, 2000; and Rule 72, Fed. R. Civ. P.

[3] The parties have consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (*See* Doc. 9).

denied as moot because its motion for summary judgment is due to be granted even if McKinney's declaration is considered in its entirety.

## I.     BACKGROUND[4]

Aquatic Gardens is a Birmingham-area corporation that markets, sells, and services outdoor fountains and water gardens. McKinney is an African-American woman who began working at Aquatic Gardens near the end of May 2007 as a contract worker, having been placed there through a temporary employment agency. McKinney worked as a part-time assistant to the office manager, Joan Layton, a white female, in the bookkeeping area. After a few weeks, Layton suggested to the president and owner of Aquatic Gardens, Charles Thomas, a white male, that McKinney seemed to be doing well in the office and that it would be more economical to buy out her contract with the temp agency and have her work directly for Aquatic Gardens. Recognizing that Aquatic Gardens was paying the agency $13.00 per hour, $11.00 of which went to McKinney, Thomas agreed. Accordingly, on June 11, 2007, McKinney started working as an employee of the company, still in the same part-time assistant role, for $11.00 per hour.

During her employment, McKinney reported directly to Layton, who managed the day-to-day operations of Aquatic Gardens' retail store. Layton, in turn, reported directly to Thomas. As an assistant in the bookkeeping area, McKinney was generally responsible for posting and receiving payments, as well as payroll, handling bank statements and making payments on credit cards.

---

[4]     At summary judgment, the court views the facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). The court therefore does so here, drawing those facts from the pleadings, depositions, and other evidentiary materials on file. Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts nor all of the facts. *See Crawford v. Carroll*, 529 F.3d 961, 964 n.1 (11th Cir. 2008).

(Deposition of Andrea McKinney ("McKinney Dep.")[5] at 49).   In carrying out these types of functions, McKinney's duties required her to make entries and generate estimate reports using QuickBooks accounting software in the particular manner that Thomas desired.  (McKinney Dep. at 52-53).  McKinney had some prior experience using QuickBooks, which allows a company to custom-tailor codes for payments and amounts owed in varying ways to suit its needs.  (Declaration of Plaintiff Andrea McKinney ("McKinney Decl.")[6] ¶ 3).   However, it is undisputed that she encountered some difficulties in meeting Thomas's expectations regarding the reports.  When asked if she had "any difficulties in performing the work," McKinney acknowledged that she "had to adjust to the way Aquatic Gardens handled their books," in particular the way that Thomas wanted the QuickBooks estimate reports to be laid out.  (McKinney Dep. at 52).  Similarly, when asked whether she felt like she was "making progress in making that adaptation as to how Mr. Thomas wanted [the reports]," McKinney admitted that "it was slow."  (*Id.* at 54).  She also recalled instances in which Thomas became upset because the QuickBooks reports she had prepared were not done in accordance with the way he wanted them.  (*Id.* at 59).

McKinney contends, however, that any such problems she was facing in this regard were, in her opinion, just a part of the normal period of adjustment that accompanies learning a new job. (McKinney Decl. ¶ 3).  Moreover, she claims that her difficulties in creating reports the way Thomas wanted them were not caused by any lack of ability or effort on her part.  Rather, she says, they stemmed from the fact that Layton did not give her the training, direction, and information necessary

---

[5]/   McKinney's Deposition is "Evidentiary Submission B" within the Defendant's Evidentiary Submission in Support of Motion for Summary Judgment, Doc. 19, at pp. 15-136.

[6]/   McKinney's Declaration is Doc. 22-1.

to supply what Thomas wanted. (McKinney Decl. ¶¶ 3, 6; McKinney Dep. at 59-60). It is undisputed that at some point, Layton convinced Thomas to send McKinney to a one-day seminar for additional training on how to use QuickBooks, which McKinney acknowledges was helpful. (McKinney Dep. at 19; Deposition of Joan Layton ("Layton Dep.")[7] at 17, 34). However, McKinney alleges not that she lacked training or information about the use of the software *generally* but rather that Layton did not adequately explain the specific custom-coding required to generate the reports as Thomas wanted them. (McKinney Decl. ¶ 3). In this vein, McKinney recalls that there were times that she and Layton were supposed to get together so that Layton could show her how everything was supposed to be entered but that these scheduled meetings at times did not occur because Layton was so busy managing the store. (McKinney Dep. at 54).

While working as a "temp" and shortly thereafter, McKinney was working between 20 and 25 hours per week, arriving between 8:00 and 9:00 a.m. and leaving between 12:00 and 1:00 p.m., Monday to Friday. (*Id.* at 50). She had wanted such a part-time schedule because she needed time to care for one of her children who had health issues. However, about a week after McKinney started working directly for the company in mid-June, Layton asked her to come in earlier, between 7:30 and 8:00 a.m., and stay later, until about 4:00 p.m., until she was able to get a handle on doing the work in the way Thomas wanted it. While McKinney stated that she thought that the job was supposed to be only part time, she did attempt to work the expanded schedule, although with some difficulties. While there were days that she was unable to come in early or stay late, McKinney admits she was never disciplined on any of those occasions. (McKinney Dep. at 65-66). In any event, McKinney suggests that even when she did come in early, Layton still did not provide her with

---

[7]／     Layton's Deposition is Doc. 22-2.

the necessary training and information regarding the QuickBooks codes to do the reports the way that Thomas wanted them.  (*Id.* at 62).

What McKinney complains most about, however, and what she says ultimately prompted her resignation, were racial remarks by Layton.  During the approximately three-week period that McKinney was employed as a temp worker, she acknowledges she had no problems with Layton or the work atmosphere at Aquatic Gardens.  (*Id.* at 56).  Starting sometime thereafter, though, it became "not uncommon" for Layton to use the word "nigger" around McKinney.  (McKinney Decl. ¶ 13).  For Layton's part, she acknowledges that, "just playing around," she used racial language perhaps "a couple of times."  (Layton Dep. at 21).  One of these, Layton says, involved an instance in McKinney's presence where Layton used the phrase "'my nigga,' like you hear in music or friends or what have you, not meaning it in a negative manner."  (*Id.* at 22).  Layton further admits that she and McKinney were "discussing the N-word," whereby Layton would have said, "To me, the N-word is not a color.  It's a way of life."  (*Id.* at 23).  McKinney, however, estimates that Layton used the word "nigger" around her "several times on an almost weekly basis."  (McKinney Decl. ¶ 13).  McKinney recognizes, though, that Layton appeared to consider her own use of the word as joking or humorous and thought that McKinney would understand it as such.  McKinney testified at her deposition as follows:

A.    Everything [Layton] said was in – it sounded as if it was a joke.

Q.    Now, you said she made jokes.  Were these racial jokes?

A.    Yes.

Q.    And we've got to be frank here.  You just need to tell me what you recall her saying.

A.     I don't really recall the jokes themselves, but I know that they were always in reference to black or the "N" word.  Her husband would refer to her at times as the "N" word, as a lover of African-American people.  And she would try to explain that she wasn't, you know, a racist in any kind of way.  So everything that she said in lure of that was in the form of a joke.

Q.     How often during your time at Aquatic Gardens would you say that you heard her use the "N" word?

A.     I don't recall the amount of times.  I do know that she felt comfortable enough that she could say it and then not – and it didn't mean what most people would take it, because she though that I was this very cool individual that understood what she was saying.  She felt very comfortable with me.

Q.     You are saying that she felt – or it appeared that she felt that you and she had some rapport about this type of thing?

A.     Yes.

(McKinney Dep. at 85-86).  McKinney also recalls an occasion whereupon Layton offered to let McKinney live in her house.  (*Id.* at 105-06).  McKinney said she was looking for a place to live at the time when Layton extended the invitation but that Layton added that she would love to see the look on her husband's face for her to now have a black woman living in the house with her.  (*Id.* at 106-07).  The plaintiff declined the offer, feeling uncomfortable with the idea of coming between Layton and her husband.  (*Id.* at 106).

McKinney says she was offended and hurt by Layton's racial remarks.  (McKinney Decl. ¶ 10).  At some unidentified point during her employment, McKinney made these feelings known to Layton.  At that time, McKinney told Layton that the racial remarks she made about African-Americans and Hispanics bothered her.  (*Id.* ¶ 13).  Layton responded that did not mean any harm by it and that she was not a racist.  (McKinney Dep. at 86-87).  McKinney replied by explaining that whether Layton thought she was a racist or not, it sounded bad and hurt her feelings.  (McKinney

6

Dec. ¶ 13).  McKinney admits that she did not hear Layton make racial slurs in the workplace after that.  (*Id.*)

McKinney does complain, however, of two race-related episodes that occurred thereafter. First, McKinney recalls that on one occasion at work, in front of McKinney and other employees, Layton remarked that she needed to be careful of what she said from now on because McKinney might call the NAACP on her.  (*Id.*; McKinney Dep. at 85).  McKinney says that the remark hurt her feelings and made it seem as if Layton was belittling her complaints.  (McKinney Decl. ¶ 13).

In the second incident, McKinney had accompanied Layton for drinks after work at the Superior Grill, a Mexican restaurant located near the store.  McKinney had never gone out socially with Layton or other co-workers at Aquatic Gardens.  On this occasion, however, McKinney agreed to go because Layton appealed that she really needed someone to talk to, and McKinney knew that Layton was having problems with her husband.  (McKinney Dep. at 80-81).  Once at the establishment, though, Layton became "really inebriated," to the point of being unable to keep her balance at times.  (*Id.* at 81-82).  Indeed, McKinney recalls Layton "falling to the floor while trying to make her way to the bar" at one point during the evening.  (*Id.* at 83).  In any event, while McKinney and Layton were at the restaurant, they were approached by an individual they did not know, a white man, who struck up a conversation with them.  (*Id.* at 82).  McKinney and the gentleman began laughing and talking and listening to the band when Layton leaned over and asked him something to the effect of "Do you know that she's a nigger?" or "Do you know that you are trying to hit on a nigger?"  (*Id.* at 82; Deposition of Ashley Barker ("Barker Dep.")[8] at 12-13).

---

[8]/     Barker's Deposition is "Evidentiary Submission C" within the Defendant's Evidentiary Submission in Support of Motion for Summary Judgment, Doc. 19, at pp. 137-158.

McKinney was very shocked and began to leave when Layton protested, "No, no. We're just starting to have fun." (McKinney Dep. at 82). Ultimately, whenever their evening ended, McKinney escorted Layton outside to Layton's car and offered to drive her home, but Layton declined. (*Id.* at 82).

On the morning of August 1, 2007, McKinney advised Thomas that she was resigning her employment. McKinney told Thomas that she loved working for Aquatic Gardens and appreciated the opportunity to have worked there, but she felt that she could not produce the QuickBooks reports in the format that Thomas wanted them. (Affidavit of Charles Thomas ("Thomas Aff.")[9] ¶ 21). Several days later, however, she telephoned Thomas and told him that the reason she had resigned actually had to do with issues she had with Layton. (McKinney Dep. at 93). Specifically, she complained about the Superior Grill incident where Layton had called her a nigger. (Thomas Aff. ¶ 21).

McKinney also claims in this action that she was paid less because of race. Decisions regarding employee pay were made by Thomas, with input from Layton. McKinney was paid $11.00 per hour. In addition to McKinney, there were four employees, all them white and female, who performed accounting duties for Aquatic Gardens around that this same time period and have potential relevance to the disparate pay claim: Layton, Tammy Holt, Melba Miller Duffie, and Roy "Joey" Sanford. Layton was originally hired in March 2006 to act as the full-time bookkeeper at a salary of about $13.00 per hour. Over time, she assumed greater responsibilities and became the office manager and retail director, necessitating the hire of someone to assist with bookkeeping

---

[9]  Thomas's Affidavit is included within "Evidentiary Submission A" of the Defendant's Evidentiary Submission in Support of Motion for Summary Judgment, Doc. 19, at pp. 2-5.

duties.  Holt was the first to work in that role, being paid $10.50 per hour from February 11, 2007 to March 10, 2007.  After she left, Thomas hired Duffie and paid her $14.00 per hour.  However, she quit on the second day of work because she was unaccustomed to Aquatic Gardens's accounting system, and Layton was required again to do most of the bookkeeping while Thomas searched for a replacement for Duffie.  McKinney arrived in late May 2007 and held the assistant bookkeeper position until resigning on August 1, 2007.  McKinney, in turn, was eventually replaced by Sanford, who started at $13.00 per hour, and he still held the position as of May 2009.

Thomas states that he set McKinney's pay based on "her skills and experience; the fact that she would be working part time and [was] not yet up to speed on the way [the company] used the QuickBooks system for tracking ... job matters; and because she had been making the same rate while working with the temporary service." (Thomas Aff. ¶ 16).  Thomas asserts that he paid Layton, Duffie, and Sanford more than McKinney based on his business judgment as to the extent of their skills, training, experience, scope of duties, and business circumstances.  (*Id.* ¶¶ 16, 20).  Specifically, Thomas claims that he paid Layton more because she was hired as a full-time, full charge bookkeeper, while McKinney was only a part-time employee in an assistant role, and that Layton also at the time had eight years experience in bookkeeping and "extensive experience" in QuickBooks software.  (*Id.* ¶ 16).  Thomas states that Duffie's salary was a compromise on her demand for $15.00 per hour and was based on the fact that she had about 30 years experience as a full-charge bookkeeper.  (*Id.* ¶ 18).  Finally, Thomas maintains that he paid Sanford more because of his greater education level, having earned a B.S. degree in computer science with a minor in accounting from Jacksonville State University, while McKinney has no college degree, and because Sanford had over sixteen years experience in bookkeeping and accounting jobs.  (*Id.* ¶ 19).

## II.    SUMMARY JUDGMENT STANDARDS

Rule 56(c)(2), Fed. R. Civ. P., provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *United States v. Four Parcels of Real Property in Greene and Tuscaloosa Counties in the State of Alabama*, 941 F.2d 1428, 1437 (11th Cir. 1991) ("*Four Parcels*") (quoting *Anderson*, 477 U.S. at 248, 251-52).

The party moving for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Where the movant for summary judgment will not bear the burden of proof on a claim or issue at trial, the movant can satisfy this initial burden of production at summary judgment by pointing to specific portions of the record materials on file that either negate an essential element of the non-movant's claim or that affirmatively indicate that the party bearing the burden of proof at trial will not be able to meet that burden.'" *Clark*, 929 F.2d at 608; *see also Four Parcels*, 941 F.2d at 1438 & n.19.

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must — by affidavits or as otherwise provided in [Rule 56] — set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

10

Rule 56(e)(2), FED. R. CIV. P.  In undertaking its analysis, "the judge's function is not himself to weight the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.  Accordingly, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

## III.   DISCUSSION

### A.   Overview of the Plaintiffs' Claims

McKinney's brings three different types of race discrimination claims against Aquatic Gardens, all based upon 42 U.S.C. § 1981.  That statute protects the equal right of "[a]ll persons within the jurisdiction of the United States" to "make and enforce contracts" without respect to race. 42 U.S.C. § 1981(a). The statute currently defines "make and enforce contracts" to "includ[e] the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).  The three types of claims at issue in this action are based upon allegations of disparate pay, hostile work environment, and constructive discharge.  The court will address each of these in turn.

### B.   Disparate Pay

Section 1981 affords a cause of action to an employee who is subjected to purposeful race discrimination in compensation.  *See Price v. Lockheed Space Operations Co.*, 856 F.2d 1503, 1507 (11th Cir. 1988).  The parties agree that McKinney's disparate pay claim is subject to analysis at summary judgment using the familiar burden-shifting *McDonnell Douglas* framework applicable to discrimination claims founded upon circumstantial evidence. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under that

11

framework, the plaintiff has the initial burden to prove a *prima facie* case of discrimination. *Burdine*, 450 U.S. at 252-53. "Under the *McDonnell Douglas* scheme, '[e]stablishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993) (quoting *Burdine*, 450 U.S. at 254). This presumption "places upon the defendant the burden of producing an explanation to rebut the *prima facie* case- *i.e.*, the burden of 'producing evidence' that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *Id.*, 509 U.S. at 506-07 (quoting *Burdine*, 450 U.S., at 254). Once the defendant produces sufficient evidence to support a nondiscriminatory explanation for its decision, the plaintiff must be afforded the "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (*quoting Burdine*, 450 U.S. at 253).

The parties dispute the requirements of a *prima facie* case of disparate pay generally and over whether McKinney can present sufficient evidence here. McKinney contends that she makes out a prima face case by showing that she is a member of a protected class and that one or more employees outside of her class held the same or a sufficiently similar job and was paid more. Under that formulation, she asserts, she has established a *prima facie* case with regard to three white employees who held the same or similar bookkeeping jobs as she did: Joan Layton, Melba Miller Duffie, and Roy "Joey" Sanford. Aquatic Gardens contends, however, that McKinney must also demonstrate

that she had the same or better qualifications, *e.g.*, education, training, work experience, than her would-be comparators.  Aquatic Gardens further contends that she cannot make that additional showing, foreclosing the pay claim at the *prima facie* stage.

McKinney is correct that evidence that another employee of a different race was paid more for performing the same or a sufficiently similar job as the plaintiff is sufficient in itself to make out a *prima facie* case which, in turn, requires an employer to come forward with evidence indicating that the discrepancy was based upon the employer's consideration of one or more legitimate reasons. *See Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1185 (11th Cir. 2005) ("'Under the *McDonnell Douglas/ Burdine* approach, a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males.'" (quoting *Meeks v. Computer Associates Intern.*, 15 F.3d 1013, 1019 (11th Cir. 1994)).  In that context, an employer will often cite the relative qualifications and experience of the plaintiff and a comparator as the basis for a pay discrepancy, but such considerations are applicable to the second and third steps of the *McDonnell Douglas* analysis rather than at the *prima facie* stage.  *Cf. Walker v. Mortham*, 158 F.3d 1177, 1193 (11th Cir. 1998) (plaintiffs alleging discriminatory failure to hire for failure to promote in violation of Title VII are not required to establish that they were equally or more qualified than successful applicants for their coveted positions); *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) ("A plaintiff establishes a *prima facie* case [under the Equal Pay Act] by comparing the jobs held by the female and male employees, and by showing that those jobs are substantially equal, not by comparing the skills and qualifications of the individual employees holding those jobs.").  To hold otherwise would be effectively to conflate the *McDonnell Douglas* analysis into a single step in which a court essentially examines the record

13

to determine whether there was any legitimate reason that employer *theoretically could justify* paying the plaintiff less, without ever requiring the employer to produce any evidence regarding why it *actually* did so.

Even assuming, however, that McKinney has established a *prima facie* case with regard to each of her three would-be comparators, she cannot prevail on *McDonnell Douglas*. At the second step, an employer's burden to articulate a non-discriminatory reason for an employment decision is a burden of production, not of persuasion. *Burdine*, 450 U.S. at 254. "As this burden involves no credibility determination, *St. Mary's Honor Center*, 509 U.S. at 509, it has been characterized as 'exceedingly light.' *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir. 1983)." *Vessels v. Atlanta Independent School System*, 408 F.3d 763, 770 (11th Cir. 2005). "So long as the employer articulates 'a clear and reasonably specific' non-discriminatory basis for its actions, it has discharged its burden of production. *Id.* (quoting *Burdine*, 450 at 254-55).

McKinney argues that Aquatic Gardens has not satisfied its burden at this intermediate step of *McDonnell Douglas*. She appears to be wrong. It is undisputed that McKinney was paid $11.00 per hour, while Layton and Sanford were each hired at an hourly wage of about $13.00, while Duffie's was hired at $14.00 per hour. In both his deposition and his affidavit, Thomas gives clear and specific reasons for his decisions regarding the compensation of McKinney and the three comparators. (*See* Thomas Dep. at 22-28, 54-55; Thomas Aff. ¶¶ 6, 7, 16-20). Thomas states that he set McKinney's pay based on "her skills and experience; the fact that she would be working part time and [was] not yet up to speed on the way [the company] used the QuickBooks system for tracking ... job matters; and because she had been making the same rate while working with the temporary service." (Thomas Aff. ¶ 16). Thomas asserts that he paid Layton, Duffie, and Sanford

14

more than McKinney based on his business judgment as to the extent of their skills, training, experience, scope of duties, and business circumstances. (*Id.* ¶¶ 16, 20). Specifically, Thomas claims that he paid Layton more because she was hired as a full-time, full charge bookkeeper, while McKinney was only a part-time employee in an assistant role, and that Layton also at the time had eight years experience in bookkeeping and "extensive experience" in QuickBooks software. (*Id.* ¶ 16). Thomas states that Duffie's salary was a compromise on her demand for $15.00 per hour and was based on the fact that she had about 30 years experience as a full-charge bookkeeper. (*Id.* ¶ 18). Finally, Thomas maintains that he paid Sanford more because of his greater education level, having earned a B.S. degree in computer science with a minor in accounting from Jacksonville State University, while McKinney has no college degree, and because Sanford had over sixteen years experience in bookkeeping and accounting jobs. (*Id.* ¶ 19). Such evidence easily satisfies Aquatic Gardens's intermediate burden.

At the third and final stage of the *McDonnell Douglas* analysis, the question becomes whether the plaintiff can point to evidence sufficient to allow a jury to reasonably conclude that the reasons offered by Aquatic Gardens are a pretext for unlawful race discrimination. "[The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the [defendant's] proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. However, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir.2004). Nor does an employee establish pretext merely by questioning the wisdom of such a reason. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir. 2001). "Federal courts 'do not sit as a super-personnel

department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [federal anti-discrimination law] does not interfere.'"  *Chapman v. AI Transport*, 229 F. 3d 1012, 1030 (11th Cir. 2000) (en banc) (quoting *Elrod v. Sears, Roebuck & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.,* 864 F.2d 1359, 1365 (7th Cir. 1988) (citations omitted))).

In support of her claim of pretext, McKinney offers virtually no evidence.  While there is evidence that Layton would provide input and make recommendations on how much employees were paid, McKinney does not dispute that Thomas, the company's sole shareholder, president and CEO, was the final decision-maker on such matters.  McKinney offers no evidence that Thomas made racial remarks or jokes or otherwise harbored racial animus.  She also does not contest that Thomas had a basis of knowledge for his asserted understanding and consideration of the relative qualifications of the employees at issue and of the business circumstances and conditions surrounding their respective hires.  Instead, McKinney relies upon what are essentially two pieces of evidence from which she contends that a trier of fact could nonetheless reasonably conclude that the reasons Thomas offers did not actually motivate the employee compensation decisions.

First, McKinney cites her own deposition testimony relating that, when she had asked Layton soon after being hired as a direct employee why she was earning less than the $13.00 to $14.00 per hour Layton had revealed had been made by past bookkeepers, Layton did not articulate any real explanation, instead stating simply that "she would consider paying more later."  (*See* McKinney Dep. at 102-05).  Statements made by a decision-maker contemporaneously with an employment decision may support a finding of pretext where they are inconsistent with reasons subsequently

16

offered in litigation truly motivated an employment decision. *See Taylor v. Runyon*, 175 F.3d 861, 867-68 (11th Cir. 1999) (testimony that decision-maker had stated that he was leaning towards awarding sought position to male because he had a wife and family to support and thus needed more money than the female plaintiff tended to show that employer's proffered reasons based on relative qualifications and work history were pretextual).   However, that Layton declined to provide McKinney with a substantive justification for why she was being paid what she was relative to prior employees has little to no probative value on the issue of pretext.  As a threshold matter, an employer has no legal obligation to explain why it has paid more to one employee than another.  Employers may reasonably tend to be circumspect about discussing the relative compensation of individual employees because such discussion may be disruptive to the workplace.  *See generally, e.g., Northeastern Land Services, Ltd. v. NLRB*, 560 F.3d 36, 38 (1st Cir. 2009) (requiring employees to sign an employment contract that prohibited disclosure of the terms of employment, "including compensation").  And equally to the point, it is undisputed that while Thomas did discuss employee pay with Layton, decisions on the matter ultimately rested squarely with Thomas.  "[C]omments by non-decisionmakers do not raise an inference of discrimination, especially if those comments are ambiguous." *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355 (11th Cir. 1999).  Accordingly, the fact that Layton put off a query by McKinney, a brand new part-time employee, that seemed to be an overture for a raise right out of the gate, so to speak, with a suggestion that McKinney might earn more later, simply gives no meaningful indication that Thomas is not now giving an honest account of his behavior.

Second, McKinney argues that she may be able to show pretext on the theory that her prior work experience warranted higher pay.  Noting that Layton testified that the bookkeeping job had

a pay range of $10.00 to $13.00 per hour, McKinney laments that she was paid "at the bottom of this range" despite the fact that she had "approximately six (6) years of accounting service involving income tax preparation."   (Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment ("Pl. Opp.")[10] at 19).   However, "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997) (citations omitted).    Accordingly, McKinney's opinions and characterizations concerning her qualifications, experience, and worth in the marketplace are essentially beside the point.   Suffice it to say here that McKinney's argument on this point amounts to mere quibbling with the wisdom of Thomas's offered explanation regarding his assessments of the qualifications of McKinney and her comparators and the responsibilities of the jobs that Thomas hired them to perform.   *See Chapman*, 229 F. 3d at 1030.   Based on the foregoing, the court concludes that McKinney has failed to show pretext and that Aquatic Gardens is entitled to summary judgment on the disparate pay claims.

### C.    Hostile Work Environment

McKinney also contends that she was subjected to a racially hostile work environment, a claim also cognizable under § 1981.   *See Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009). The parties agree that in order to establish such a claim, McKinney would have the burden at trial to prove the following elements: (1) that she belongs to a protected group; (2) that she has been subject to unwelcome harassment; (3) that the harassment was based on race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such

---

[10]/       McKinney Opposition Brief in Doc. 21.

environment under either a theory of vicarious or of direct liability.  *Id* (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).

The only element that Aquatic Gardens challenges now is whether harassing conduct was sufficiently severe or pervasive to be actionable.  "'[T]his element contains both subjective and objective components; that is, "to be actionable, [the harassment] must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceive[s] to be abusive."'"  *Bryant*, 575 F.3d at 1297 (quoting *Miller*, 277 F.3d at 1276, quoting, in turn, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)).  Aquatic Gardens contends in its brief that the evidence shows that "Layton made use of racial 'insults' or terminology in what both she and McKinney thought was a 'joking manner.'"  (Dft. Brief at 22).  While it is not entirely clear, such a statement may suggest that Aquatic Gardens is taking a position that McKinney did not subjectively conceive such comments to contribute to a racially hostile work environment.  Even assuming that McKinney's deposition testimony might be construed as ambiguous on that issue, however, her declaration clarifies that while she perceived *Layton* as believing that her racial comments were made in jest, McKinney herself was offended and hurt by the comments nonetheless.  (McKinney Decl. ¶¶ 10, 13).  Crediting McKinney's declaration testimony on the point, and assuming for purposes of Rule 56 that the record supports that McKinney subjectively considered her work environment to be racially hostile, the first question is resolved in Ms. McKinney's favor.  *See Williams v. General Motors Corp.*, 187 F.3d 553, 566 (6th Cir. 1999) ("The fact that [the plaintiff] thought that [his supervisor] meant his comments to be a joke does not necessarily mean that [the plaintiff] perceived them as a joke.  Simply put, humor is not a defense under the subjective test if the conduct was unwelcome.").

19

The objective component of the "severe or pervasive" requirement of a hostile work environment claim acts to filter out claims based on complaints over "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [offensive] jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) [do] not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal citations omitted). Federal anti-discrimination laws, including § 1981 and Title VII of the Civil Rights Act, do not impose a "general civility code" in the workplace. *Id.* Rather, the "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.*

The Eleventh Circuit has further explained:

> [T]he Supreme Court and this court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.

*Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc) (citations omitted).

The record demonstrates that Layton's conduct about which McKinney complains is simply not sufficiently severe or pervasive to be actionable as a hostile work environment under § 1981. Her claim is founded almost entirely upon Layton's use of racial remarks, mostly the term "nigger" and variations on that term in other contexts. "For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity,

meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted); *see also Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995) (indicating that racial slurs may be actionable when they are so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." (internal quotation marks and citation omitted)); *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (recognizing that "not every uncalled for, ugly, racist statement" made in the workplace is actionable).

In terms of frequency, McKinney claims that Layton used the word "several times on an almost weekly basis." (McKinney Decl. ¶ 13). In this case, that translates to only a handful of occasions. McKinney worked at Aquatic Gardens for only ten weeks, from the last week of May 2007 to August 1, 2007, and she admits that there was nothing even potentially harassing occurred for the first three weeks, until sometime after she began working directly for the company on June 11, 2007. Thus, the period of alleged harassment was at most about seven weeks, suggesting perhaps six or seven instances, viewing the evidence in the light most favorable to McKinney.

The specifics of instances in which Layton used such slurs are also largely unclear. Layton herself admits to having used the slur "a couple" of times around McKinney, one of which involved her use of the phrase "my nigga." (Layton Dep. at 21-22). McKinney suggests that Layton used it a bit more frequently, although she is likewise able to recall particulars regarding only two episodes. First, she says that Layton told her that Layton's husband did not like African-Americans and that he had referred to Layton as a "nigger lover." Second, McKinney references the incident whereupon she agreed to join Layton for drinks at the Superior Grill restaurant after work. On that occasion,

Layton, literally falling-down drunk, asked a white man who had come over to them and was talking to McKinney if he knew "that she's a nigger?"  When McKinney started to leave, Layton attempted to convince her to stay, stating that they were "just starting to have fun."  While Layton's offensive remark is relevant to understanding the dynamics of McKinney's ongoing relationship with Layton thereafter at work, the fact that this incident occurred in a social setting after work hours off company premises reduces the impact of the incident itself in creating hostility in the work environment as such.  *See Butler*, 536 F.3d at 1213 (noting that co-employee's use of racial epithet occurred outside of the workplace as supporting that the incident was not actionable harassment under Title VII); *Geer v. Marco Warehousing, Inc.*, 179 F. Supp. 2d 1332, 1340 (M.D. Ala. 2001) ("As a general proposition, employers are not responsible under Title VII for hostile ... acts resulting from non-work-related, off-duty interactions between co-employees." (quoting *P. v. Delta Air Lines, Inc.*, 102 F. Supp. 2d 132, 138 (E.D.N.Y. 2000), vacated in part on other grounds, *Ferris v. Delta Air Lines*, 277 F.3d 128 (2d Cir. 2001)).

McKinney concedes that after she told Layton that she was offended and hurt by Layton's racial remarks, McKinney never again heard Layton use a slur in the workplace.  It is not clear exactly when that exchange took place, but the only racial remark occurring at work thereafter about which McKinney complains is one occasion in which Layton stated in front of McKinney and others that she, Layton, had to be careful about what she said or McKinney might "call the NAACP."  While that utterance looks to have been insensitive and could be construed as somewhat offensive, McKinney admits that Layton said it in what sounded like a joking manner.  (McKinney Dep. at 85). Indeed, by her own testimony, McKinney's admits that she believed Layton to have conceived her own use of racial language and epithets as joking or horseplay that was acceptable within the

22

boundaries of their relationship as Layton thought them to be, rather than as a pejorative, abusive, or mean-spirited epithet. Specifically, McKinney testified that she understood Layton to believe that she had a rapport and comfort level with McKinney that afforded Layton a certain latitude in what she could say to and in front of McKinney. Of course, that does not make Layton's use of slurs or other racial language appropriate or acceptable in the workplace. "Far more than a 'mere offensive utterance,' the word 'nigger' is pure anathema to African-Americans." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001). It is "perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (quoting Merriam-Webster's Collegiate Dictionary 784 (10th ed.1993)). Nor should the court be understood to imply that McKinney was unreasonable in feeling hurt and offended, even if she understood that Layton did not intend that result. While use of the word is almost always inappropriate in most social contexts, it is nearly universally so when used by whites. *See generally* Randall L. Kennedy, *Who Can Say "Nigger"? And Other Considerations*, The Journal of Blacks in Higher Education 86 (Winter 1999-2000).[11] Nonetheless, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81-82 (1998). The fact that Layton thought (mistakenly as it turned out) her use of the racial slur did not offend McKinney, and, more importantly, that *McKinney herself understood that to be Layton's thinking*, does reduce to some degree the capacity of Layton's remarks, offensive as they may be, to give rise to what a reasonable person would consider to be a "hostile or abusive" work environment

---

[11]/    A copy of this article is also available online at http://philosophy.csusb.edu/~tmoody/whocansaynigger.pdf.

23

because of race. *See Hansen v. Perry Technologies*, 206 F. Supp. 2d 1223, 1232 (S.D. Fla. 2002) ("[W]hile the Court recognizes that [the plaintiff] subjectively felt that [his supervisor's] comments were severe, many other employees (including [the plaintiff] himself) considered [the supervisor] a 'jokester' and some saw his comments as made in this vein.  This is a factor to be considered in the objective inquiry, although obviously making discriminatory comments in a joking manner of course does not completely relieve them of their pejorative weight.").

In support of her claim that she was subjected to severe or pervasive racial harassment, McKinney also points out that Layton said that she "would love to see the look on [her husband's] face for [her] to have a black woman living in the house with her" when Layton offered to allow McKinney to come live with her.  (McKinney Dep. at 106-07).  The remark, however, has only the slight value in establishing a hostile work environment.   The remark certainly does *refer* to McKinney's race and may be viewed as insensitive and capable of creating feelings of awkwardness, if not some offense.  But it is difficult to construe it as significantly "hostile" or "abusive" given that it accompanied *Layton's invitation to McKinney to come live with Layton at her home, at a time when McKinney was looking for a place to live.*

And finally, McKinney suggests that "Layton intentionally withheld necessary training from Ms. McKinney and misled company's owner as to what was being done for training."  (Pl. Opp. at 13-14).   The summary judgment record does support that Layton allegedly failed to provide McKinney with certain training and information regarding how to use QuickBooks software to generate accounting reports in the particular format that Thomas wanted them.  However, the record indicates that McKinney did not suffer any disciplinary action or any adverse action as a result. More to the point, McKinney has not cited any evidence to support that Layton "intentionally

withheld" such training, because of race or otherwise. McKinney makes no allegation to that effect in her testimony. To the contrary, McKinney's testimony suggests that, to the extent that Layton failed to provide her with training, it was because Layton was so busy with her responsibilities managing Aquatic Gardens retail store (McKinney Dep. at 54, 59), and also potentially in part because McKinney herself was unable at times to come in early or stay late to work with Layton. (*Id.* at 65-66). In addition, notwithstanding Layton's racial remarks, the evidence is undisputed that she not only invited McKinney to come live with her but also convinced Thomas both to hire McKinney as a regular employee and to pay to send her to a training seminar on QuickBooks when she was having trouble with the reports. In such circumstances, and in the absence of any substantial contrary evidence, one simply cannot reasonably infer that Layton intentionally withheld training from McKinney because of race. *Cf. Curtis v. Teletech Customer Care Mgmt (Telecommunications), Inc.*, 208 F. Supp. 2d 1231, 1242 n.13 (N.D. Ala. 2002) ("When the same actor hires a person ... within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." (quoting *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (further citation and internal quotation marks omitted)); *Williams v. Vitro Services Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) (evidence that the same actor both hired and fired the plaintiff may give rise to a permissible inference that no discriminatory animus motivated the firing decision).

Finally, circuit precedent compels the conclusion that McKinney was not, in the brief seven-week period of her employment, subject to racial harassment sufficiently severe or pervasive to be actionable under federal anti-discrimination laws. *See McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) (holding that a black employee's allegations that a white employee called her "girl"

25

and two male black employees "boys," and that another coworker referred to a former black employee as a "nigger bitch" did not amount to severe or pervasive harassment); *Butler*, 536 F.3d at 1213 (holding evidence was "not even close" to demonstrating a viable claim where it showed that an African-American plaintiff's co-worker referred in her presence to an African-American man as a "stupid mother fucking nigger" and a few minutes later called him a "stupid ass nigger" and said that she hoped someone would "run over his ass and kill him."); *Barrow v. Georgia Pacific Corp.*, 144 Fed. Appx. 54, 58 (11th Cir. 2005) (unpublished) (finding racial symbols and slurs, including the presence of rebel flags and the letters "KKK" in the workplace, in addition to several other comments referring to plaintiff as "nigger" and "boy," did not constitute "sufficiently severe or pervasive" harassment to alter the conditions of plaintiff's employment); *LaBeach v. Wal-Mart Stores, Inc.* [No. 5:07-CV-12(HL)] 2009 WL 902030, *4 (M.D. Ga. Mar. 27, 2009) (granting summary judgment on racial harassment claim where supervisor, among other things, made three racist statements to plaintiff, including telling plaintiff to fire all black people "because they are niggers, lazy, and too stupid to do their job."); *Streeter v. City of Pensacola* [No. 05-CV-286], 2009 WL 248103, *9-10 (N.D. Fla. Feb. 2, 2009) (unpublished) (finding no hostile work environment notwithstanding infrequent use of racial epithets such as "nigger," "nigglets," the acronym "DAN" for "dumb ass nigger," and the presence of nooses and other employees wearing white sheets in the workplace); *Gant v. Kash n' Karry Food Stores, Inc.* [No. 8:07-cv-2086], 2009 WL 2163111, * 6 (M.D. Fla. July 17, 2009) (unpublished) (no racially hostile environment where co-worker made five comments in four month period, used the word "nigger," commented to an African American employee to remove her head scarf because it "was not the ghetto," and commented about an African

American employee's "ghetto booty."). Accordingly, the court concludes that Aquatic Gardens is entitled to summary judgment on McKinney's claim alleging a racially hostile work environment.

### D.    Constructive Discharge

Finally, McKinney claims that she was constructively discharged in violation of § 1981. "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bryant*, 575 F.3d at 1298 (quoting *Munday v. Waste Mgmt. of N. Amer., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997)). A plaintiff must show "the work environment and conditions of employment were so unbearable that a reasonable person in that person's position would be compelled to resign." *Virgo v. Riviera Beach Assoc.*, Ltd., 30 F.3d 1350, 1363 (11th Cir. 1994). "The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir.2001).

As discussed above, McKinney did not endure racial harassment that was sufficiently severe or pervasive to be actionable under a hostile work environment theory. As such, she has also failed to demonstrate that such harassment met the even higher standard that it so unbearable that a reasonable person in McKinney's position would have felt compelled to resign. Accordingly, Aquatic Gardens is entitled to summary judgment on McKinney's constructive discharge claim.

## IV.    CONCLUSION

Based on the foregoing, the court concludes that Aquatic Gardens motion for summary judgment (Doc. 17) is due to be granted. This is so even if McKinney's declaration, submitted in opposition to the motion for summary judgment, is considered in its entirety. Accordingly, Aquatic

Gardens's motion to strike that declaration (Doc. 27) is due to be denied as moot.  An appropriate final order will be entered.

As to the foregoing it is SO ORDERED this the 26th day of February, 2010.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE